Andrew M. Calamari
Sanjay Wadhwa
Adam Grace
Kevin P. McGrath
Neal Jacobson
Danielle Sallah
Jess Velona
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0180 (Velona)

U.S. COURTS

NOV 0 5 2018

Rcvd_____Filed_____Time_____
STEPHEN W. KENYON
CLERK, DISTRICT OF IDAHO

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Idaho #
1: 18-mc-10265-EJL

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>PLATINUM MANAGEMENT (NY) LLC;<br>PLATINUM CREDIT MANAGEMENT, L.P.;<br>MARK NORDLICHT;<br>DAVID LEVY;<br>DANIEL SMALL;<br>URI LANDESMAN;<br>JOSEPH MANN;<br>JOSEPH SANFILIPPO; and<br>JEFFREY SHULSE;<br><br>Defendants. | Civil Case No.<br><br><br>Complaint<br><br><br>Jury Trial Demanded |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint

against Defendants Platinum Management (NY) LLC ("Platinum Management"), Platinum

Credit Management, L.P. ("Platinum Credit"), Mark Nordlicht ("Nordlicht"), David Levy

("Levy"), Daniel Small ("Small"), Uri Landesman ("Landesman"), Joseph Mann ("Mann"),

Joseph SanFilippo ("SanFilippo") (collectively the "Platinum Defendants"), and Jeffrey Shulse

("Shulse") (all collectively "Defendants"), alleges as follows:

### SUMMARY

1.      This case involves a multi-pronged fraudulent scheme by Platinum Management

and Platinum Credit, the managers of hedge funds Platinum Partners Value Arbitrage Fund

L.P.(together with its feeder funds, "PPVA") and Platinum Credit Opportunities Master Fund

L.P. (together with its feeder funds, "PPCO"), respectively, led by Nordlicht, the co-Chief

Investment Officer ("CIO") of PPVA and PPCO.

2.      To existing and prospective investors, Platinum Management projected stability

and confidence, reporting steady, positive returns every year that averaged 17% annually from

2003-15.  It also guaranteed its investors liquidity, as they were permitted to redeem on 60 or 90

days' notice (depending on when they invested) and receive payment of 90% of their redemption

request within 30 days thereafter.  Marketing materials likewise stressed the fund's ready

capacity to liquidate positions.

3.      Behind the scenes, however, PPVA faced a growing liquidity crisis, which

Platinum Management, Nordlicht, Landesman, Mann and SanFilippo in various ways concealed

from existing and prospective investors for years.  In fact, PPVA's growing concentration in

illiquid positions made it ever-more difficult for Platinum Management to pay investor

redemptions on time each quarter.  Internal documents discussing redemptions are replete with

references such as "Hail Mary time," and of hoping that new subscriptions would prove

sufficient to pay current redemptions.  As early as November 2012, Nordlicht and Landesman

complained that redemptions were "daunting " and "relentless," and in June 2014 Nordlicht

wrote Landesman that "It can't go on like this or practically we will need to wind down. . . . this

is code red . . . We can't pay out 25 million in reds [redemptions] per quarter and have 5 come in." Nonetheless, existing and prospective investors were kept in the dark for years about PPVA's liquidity crisis; to the contrary, Platinum Management continued to market the fund's flexible redemption terms even as it struggled to pay redemptions.

4.      Platinum Management also deceived investors by vastly overvaluing its interest in a small oil production company, Golden Gate Oil LLC ("Golden Gate"). This position, valued at times by Platinum Management at around $170 million, purported to represent more than 19% of PPVA's total assets at the end of 2013. In fact, it was worth a fraction of that. Golden Gate consumed more than $20 million in PPVA loans and yet barely produced any oil, suffered large operating losses and never made a single interest payment on PPVA's loans. Tellingly, when Platinum Management engaged in transactions involving Golden Gate, including buying or selling options to buy interests in the company, they were at values much lower than what it carried on its books. Indeed, it eventually purchased the remaining 52% of Golden Gate for a mere $3.2 million, and yet it was still touting an enterprise valuation of at least $170 million. Platinum Management's inflation of Golden Gate's valuation by itself led to an overstatement of PPVA's AUM by as much as 13% at the end of 2014.

5.      Platinum Management also orchestrated a fraudulent scheme in connection with its other major oil investment, Black Elk Energy Offshore Operations LLC ("Black Elk"). In part to cope with the fund's deepening liquidity crisis, Nordlicht, two of his colleagues, Levy and Small, and Black Elk CFO Shulse, schemed to divert almost $100 million – proceeds of a forthcoming asset sale – out of Black Elk to benefit preferred shares held mostly by PPVA and its affiliates. The problem was that Black Elk noteholders, some of whom were independent of Platinum Management, had priority over preferred shares, and Platinum Management and its

affiliates, which dominated Black Elk's management, could not participate in any vote among noteholders to change this priority. Thus, Nordlicht and others created a deceptive consent solicitation process and rigged the vote. They secretly transferred a large block of notes from PPVA and its affiliates to various entities advised by two other entities, B Asset Manager and B Asset Manager II (together, "BAM"), for whom Levy served as CIO. They drafted a solicitation document that falsely stated that PPVA and its affiliates only held $18 million in notes, when in fact they controlled almost $100 million. BAM affiliates then joined PPVA and its affiliated funds in casting its controlling block of notes for the consent solicitation. Once the votes were counted, and Platinum Management's fraudulent scheme prevailed, Nordlicht, Levy and Small directed Shulse to wire almost $100 million out of Black Elk for the benefit of PPVA and its affiliates.

6.      Meanwhile, in 2014-15, PPVA's liquidity crisis worsened, and Platinum Management resorted to other schemes to keep the fund afloat. For example, faced with relying on heavy short-term borrowing at annual interest rates as high as 19%, Platinum Management and PPVA CFO SanFilippo told PPVA's auditor that the loans were done to complete "investment transactions" — a false explanation provided to investors in the fund's audited financials, when they were finally released to investors months later than they were supposed to be. Platinum Management's internal documents confirmed that the real purpose for the high-interest borrowing was to ease the fund's liquidity constraints.

7.      In mid-March 2015, Nordlicht, Landesman and other senior Platinum Partners officials schemed to meet a sudden wave of over $70 million in redemptions by pressing redeeming investors to cancel those redemptions or at least defer them one quarter, and to launch an aggressive push for new investment money, all while concealing PPVA's liquidity

4

crisis. Their pitch focused on anticipated investment gains in the following month, while omitting mention of the firm's significant liquidity crisis, which would obviously scare new investors and people looking to redeem.

8.      Nordlicht also treated investor monies held in separate funds under the Platinum Partners umbrella as fungible, transferring money between funds as needed to meet liquidity demands, contrary to promises made to investors in each fund and representing an obvious conflict of interest. In particular, Platinum Management schemed with Platinum Credit to have PPCO make over $30 million in loans to PPVA in least in part to help PPVA make payments that were coming due. On one occasion, $7 million in new subscriptions to PPCO was diverted to PPVA within 24 hours to pay off an overdue short-term loan owed by PPVA. Also, certain preferred redeeming PPVA investors were allowed to transfer interests worth millions of dollars to PPCO, but no cash moved from one fund to the other. The amount was merely added to the principal owed by PPVA on its outstanding loan from PPCO, and PPCO got nothing more than a promise to pay by a fund that couldn't pay its redemptions.

9.      Along the way, Platinum Management and Nordlicht also repeatedly paid redemptions in a preferential manner, even as they continued to market redemption rules that promised investors equal treatment.

10.      Eventually, in late November 2015, Platinum Management placed a majority of PPVA's assets, all highly illiquid, in a "side pocket", from which no redemptions were possible for three years. Even then, however, few redemptions were paid from the supposedly more liquid original PPVA fund.

11.      In June 2016, after the FBI executed a search warrant on Platinum Management's premises, as well as the filing of criminal charges against a co-owner of Platinum Partners (the

umbrella entity for the Platinum companies), Nordlicht announced to investors that PPVA and PPCO would stop taking in new money and would look to monetize current investments in an orderly fashion.

12.     The PPVA fund is currently in liquidation in the Cayman Islands, while the PPCO fund and another Platinum Partners affiliated fund (the Platinum Partners Liquid Opportunity Fund ("PPLO")) have contractually retained an independent monitor.  By way of this action, the Commission seeks to have a court-appointed receiver installed over the domestic PPCO and PPLO funds and their respective advisers (together, the "Receivership Entities"), in order to protect investor assets and secure a fair and orderly process by which assets are liquidated and distributions are made to investors.

## VIOLATIONS

13.     By virtue of the conduct alleged herein, Platinum Management, Platinum Credit and Nordlicht, directly or indirectly, singly or in concert, have engaged and are engaging in transactions, acts, practices and courses of business that constitute violations of Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. §§ 80b-6(1), (2), and (4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.

14.     By virtue of the conduct alleged herein, Nordlicht, in the alternative, aided and abetted Platinum Management's and Platinum Credit's violations of Sections 206(1), 206(2) and 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), (2), and (4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8; and Landesman, Levy, Mann, SanFilippo and Small aided and abetted Platinum Management's violations of Section 206(4) of the Advisers Act, 15 U.S.C. §80b-6(4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8 .

15.     By virtue of the conduct alleged herein, Platinum Management violated Section 206(4) of the Advisers Act, 15 U.S.C. §80b-6(4), and Rule 206(4)-2 thereunder, 17 C.F.R. § 275.206(4)-2.

16.     By virtue of the conduct alleged herein, Platinum Management, Platinum Credit Nordlicht, Landesman, Levy and SanFilippo, directly or indirectly, singly or in concert, have engaged and are engaging in transactions, acts, practices and courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), and Mann, directly or indirectly, singly or in concert, has engaged and is engaging in transactions, acts, practices and course of business that constitute violations of Securities Act Section 17(a)(1) and (3), 15 U.S.C. § 77q(a)(1) and (3).

17.     By virtue of the conduct alleged herein, Platinum Management, Platinum Credit Nordlicht, Landesman, Levy, SanFilippo and Small, directly or indirectly, singly or in concert, have engaged and are engaging in transactions, acts, practices and courses of business that constitute violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5, and Mann and Shulse, directly or indirectly, singly or in concert, have engaged and are engaging in transactions, acts, practices and courses of business that constitute violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. §240.10b-5(a) and (c).

18.     By virtue of the conduct alleged herein, Nordlicht and Levy, in the alternative, aided and abetted Platinum Management's and Platinum Credit's violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5; Landesman, Mann and SanFilippo, in the alternative, aided and abetted Platinum Management's violations of Section 17(a) of the

Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5; Small, in the alternative, aided and abetted Platinum Management's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5; and Shulse, in the alternative, aided and abetted Platinum Management, Nordlicht, Levy and Small's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

### NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

19.      The Commission brings this action pursuant to the authority conferred upon it by Section 209 of the Advisers Act, 15 U.S.C. § 80b-9, Section 20 of the Securities Act, 15 U.S.C. § 77t, and Section 21 of the Exchange Act, 15 U.S.C. § 78u, seeking to permanently enjoin Defendants from engaging in the acts, practices and courses of business alleged herein and for such other relief as set forth below.

20.      In addition, the Commission brings an emergency action seeking: (1) a temporary restraining order and preliminary injunction against Defendant Platinum Credit enjoining it from future violations of Sections 206(1), 206(2) and 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), (2), and (4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8; Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5; (2) appointing a receiver over the Receivership Entities; (3) prohibiting the Receivership Entities from destroying or altering any documents; and (4) permitting the Commission to conduct expedited discovery.

### JURISDICTION AND VENUE

21.      This Court has jurisdiction over this action, and venue lies in this District, pursuant to Section 214 of the Advisers Act, 15 U.S.C. § 80b-14; Sections 20(b), 20(d) and 22(a)

of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d) and 77v(a) and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

22.      Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the transactions, acts, practices, or courses of business alleged herein, certain of which occurred in this District.

23.      For example, various investors and portfolio managers were located in Brooklyn, New York, and communications in furtherance of the fraudulent schemes and other violations alleged herein were sent to them through the means or instruments of communication in interstate commerce.

## DEFENDANTS

24.      **Platinum Management** is an investment adviser registered with the Commission since September 2, 2011.  It is a Delaware limited liability company headquartered in New York, New York, and is the adviser to various funds, including PPVA.  Platinum Management's March 30, 2016 Form ADV ("ADV") reported that it had approximately $1 billion in assets under management ("AUM").

25.      **Platinum Credit,** a Delaware limited partnership headquartered in New York, New York, is a relying adviser of Platinum Management, *i.e.*, it is included within Platinum Management's umbrella adviser registration with the Commission.  Platinum Credit is the adviser to the PPCO.  Platinum Management's March 30, 2016 ADV reported that Platinum Credit had approximately $590 million in AUM in PPCO.  .

26.      **Nordlicht**, 48, resides in New Rochelle, New York.  He is chairman of Platinum Partners, the umbrella organization for the various funds, co-chief investment officer or CIO of

Platinum Management and Platinum Credit, and CIO of Platinum Liquid Opportunity
Management (NY) LLC ("Platinum Liquid"), a relying adviser of Platinum Management. He
also owns, directly and indirectly, between a 20% and 33% beneficial interest in Platinum
Management, Platinum Credit and Platinum Liquid, and he, his relatives and/or related trusts are
also investors in certain of the funds managed by the above-named advisers. Nordlicht also was
a member of the managing member of Platinum Partners Black Elk Opportunities Fund LLC
("PPBE"). From 1998-99, he held Series 7 and Series 63 licenses and was registered with
FINRA.

27.     **Levy**, 41, resides in New York, New York. He is an owner and co-CIO of
Platinum Management and Platinum Credit. He previously served as a PPVA portfolio manager
from 2006 to approximately the end of 2013, including with respect to PPVA's investment in
Black Elk. He also was chairman and CIO and general partner of the managing member of
PPBE. At the end of 2013, Levy purported to leave Platinum Partners, and he became the CIO
and 10% owner of B Asset Manager LP and B Asset Manager II LP (together, "BAM"), the CIO,
CFO, and 49.99% owner of Beechwood Re Ltd., and the CIO and 49.99% of Beechwood
Bermuda Ltd. (the latter two, together, "Beechwood").

28.     **Small**, 45, resides in New York, New York. From 2007 to at least 2014, he was a
managing director and portfolio manager at PPVA, and a portfolio manager of, among other
things, Black Elk. He also was a managing director and portfolio manager of PPBE. From July
2009 to at least 2014, he served as a Platinum Management-appointed member of Black Elk's
board of managers.

29.     **Landesman**, 55, lives in New Rochelle, New York. He was managing general
partner of PPVA and PPLO until approximately April 2015, and formerly held a percentage of

Platinum Management's ownership.  Thereafter, he continued to have substantial responsibility for investor communications for PPVA.  He also supervised PPVA's Chief Marketing Officer.

30.     **Mann**, 24, resides in Brooklyn, New York.  At times pertinent to this Complaint, he worked in the investor relations department of Platinum Management.

31.     **SanFilippo**, 38, resides in Freehold, New Jersey.  At times pertinent to this Complaint, he was the CFO of PPVA.  He is licensed as a CPA in New York.

32.     **Shulse**, 46, resides in Houston, Texas.  He was the CFO of Black Elk from approximately January to September 2014, and the CEO thereafter until early 2015.  His Texas CPA license expired in 2014 and was suspended thereafter due to Shulse's failure to complete his mandatory continuing professional education, or CPE.

## RELATED ENTITIES

33.     **PPVA** is a Cayman Islands exempted limited partnership managed directly by Platinum Management.  PPVA has the following feeder funds:  Platinum Partners Value Arbitrage (International) LTD; Platinum Partners Value Arbitrage Fund (USA) L.P.; and, Platinum Partners Value Arbitrage Intermediate Fund LTD.  The PPVA feeder funds were offered only to qualified purchasers, as that term is defined in the Investment Company Act of 1940 (the "Company Act").  PPVA was marketed as a multi-strategy fund that includes long/short fundamental equity trading; asset-based financing in energy, mining, and other industries; energy-related and Asia-based arbitrage opportunities; and event-driven investing in corporations.

34.     **PPCO** is a Delaware limited partnership managed by Platinum Credit.  It has the following feeder funds:  Platinum Partners Credit Opportunities Fund (TE) LLC; Platinum Partners Credit Opportunities Fund International (A) LTD.; Platinum Partners Credit

Opportunities Fund International LTD.; Platinum Partners Credit Opportunities Fund LLC; and,

Platinum Partners Credit Opportunity Fund (BL) LLC. The PPCO feeder funds were offered

only to qualified purchasers, as that term is defined in the Company Act. PPCO was marketed as

a single-strategy fund that invests in asset-based loans in areas such as natural resources, energy

litigation, life insurance settlements, and receivables.

35.    **Platinum Liquid** is a Delaware limited liability company that serves as the

investment manager to Platinum Partners Liquid Opportunity Fund (USA) L.P. ("PPLO USA");

Platinum Partners Liquid Opportunity Fund (International) LTD,; Platinum Partners Liquid

Opportunity Intermediate Fund L.P. and Platinum Partners Liquid Opportunity Master Fund L.P.

(the "PPLO Master Fund") (such funds, together, "PPLO"). It is a relying adviser of Platinum

Management. Platinum Management's March 30, 2016 ADV reported that Platinum Liquid had

approximately $27 million in AUM in PPLO. At times pertinent to this Complaint, Nordlicht

was the CIO for Platinum Liquid and was "responsible for oversight of all trading, asset

allocation and risk management on behalf of the Platinum-managed funds." At times pertinent

to this Complaint, Nordlicht was the majority owner of Platinum Liquid. Landesman became

President of Platinum Liquid in April 2010 and became the managing member of Platinum

Liquid effective January 1, 2011.

36.    **B Asset Manager LP and B Asset Manager II LP** (together, "BAM"),

headquartered in New York, are operationally integrated unregistered investment advisers that

manage assets primarily obtained by their controlled affiliates through reinsurance contracts with

domestic insurance companies and under investment management agreements made directly with

domestic insurance companies. Nordlicht, Levy, and two other close associates collectively

owned 68.9% of BAM through at least August 2016.  BAM claims to have approximately $2 billion in AUM and is an affiliate of the Beechwood reinsurance entities.

37.     **PPBE** is a special purpose vehicle through which other Platinum funds and individual investors obtained interests in Black Elk Class E preferred shares.

## FACTS

### Background

38.     Platinum Partners had two principal funds – PPVA, created in 2003, and PPCO, formed in 2005.  PPVA, the flagship, was billed as a multi-strategy hedge fund, ranging from long/short equity fundamental strategies and arbitrage to asset-based finance.  Meanwhile, a primary investment strategy of PPCO was "to originate a variety of high yield, fixed income instruments."

39.     PPVA was billed as a liquid fund.  Its domestic and foreign feeder fund PPMs, consistent with their respective limited partnership agreement ("LPA") and governing articles, set out a fixed, orderly redemption process for all investors:  quarterly redemptions, upon 60 or 90 days advance notice (depending on the version of the PPM), with the fund "intend[ing] to pay" to the investor at least 90% of the amount requested within 30 days, with the remaining 10% potentially held back for completion of the fund's audit.  Nothing elsewhere in the PPMs or their respective formative documents granted broad discretion to pay some redemption requests but not others, particularly those submitted in the same cycle.

40.     Platinum Management's Due Diligence Questionnaires for PPVA ("DDQs") confirmed the fund's liquidity.  From September 2013 through September 2015, they stated, in part,

> How long does it take to exit the most liquid positions in the portfolio?
> The Fund's most liquid positions could, under normal market conditions, typically be liquidated in less than a week, including assets in the Energy and Power Arbitrage,

Long/Short Fundamental Equity, Event Driven, Quantitative and Asia Based Arbitrage
strategies.

The listed liquid strategies represented more than half of the portfolio during that same period,
according to monthly "tear sheets" sent to investors, as well as marketing presentations provided
principally to prospective investors.  For example, a May 2016 presentation stated the fund was
targeting "42% risk allocation to short term trading and relative value strategies, 26% to event
driven strategies and 32% to asset based finance strategies."

41.     Fund documents also carefully delineated the separation between the finances of
the PPVA and PPCO funds.  For example, the  March 2015 PPCO and April 2015 PPVA PPMs
stated, as a risk factor, that they permitted loans to or from affiliated funds, but only in narrow
circumstances: "in the event that an affiliate fund, such as one of the Platinum-managed funds,
requires additional funds on a short-term basis in order to make an investment, the Master Fund
may loan such affiliate fund any amounts to facilitate such investment"; likewise, "in the event
the Master Fund requires additional funds on a short-term basis in order to make an investment,
the Managing Member, the Loan Portfolio Manager or their Affiliates and/or an affiliate fund,
such as one of the Platinum-managed funds, may loan the Master Fund any amounts to facilitate
such investment" (quoting PPCO Onshore March 2015 PPM; emphasis added.).

42.     On the surface, PPVA and PPCO were highly successful funds.  As of March
2016, Platinum Management reported that PPVA had almost $1.1 billion in AUM, and PPCO
had almost $600 million in AUM.  Also, PPVA reported a virtually unbroken string of strong
and steady reported performance, with its NAV going up each year from 2003 to 2015, for an
average annual return of 17%, with typically small gains reported for 85% of the months
throughout this period.

43.     Beneath the surface, however, lurked serious problems, which defendants kept from investors for years.  In fact, from at least 2012, PPVA faced recurring liquidity crises. There was a growing liquidity mismatch, as the fund became increasingly concentrated in illiquid investments, including equity and debt positions in start-up companies, many of which were not publicly traded.  And yet, many investors could and did demand their money back every quarter.  Although the liquidity crisis extended for years, Platinum Management did not – for whatever reason – sell enough of its illiquid portfolio to overcome this crisis.  Instead, it took cash out of more liquid strategies, thus skewing the balance of the portfolio toward greater illiquidity even while the liquidity pressures remained.

44.     For example, in a November 6, 2012 email entitled "Current Redemptions Nov 5, 2012," a Platinum Partners employee advised Nordlicht that there were "$27 million total," apparently referring to outstanding redemption requests.  Nordlicht forwarded this email to Landesman and stated:  "If we don't exceed this in subs [new subscriptions] from dec 1 and jan 1 we are probably going to have to put black elk [one of the fund's illiquid investments] in side pocket. I also need to pay back [a loan from an individual] and an additional 4 million oct 31 and nov 30 so we are talking 40" – apparently indicating they needed to get $40 million in new subscriptions to cover pending redemption requests and other obligations.  Landesman responded by saying he would try his best, and that he thought "…we could sweep the table here, so far, think Jan. 1st is a possibility for some, if not all."  Nordlicht replied that "it's just very daunting. It seems like we make some progress and then reds [redemptions] are relentless almost. It's tough to get ahead in subs [subscriptions] if u have to replace 150-200 a year…."  Landesman replied: "Didn't take it as complaining, it is my job. Redemptions very daunting."

45.     That said, illiquid positions, most of them categorized for accounting purposes as "Level 3" assets, which represented almost 80% of fund assets at the end of 2014, had one virtue for Platinum Management: since they were not publicly traded and there were no other readily available market prices, they were valued by Platinum Management itself, "determined in such manner as may be selected from time to time by the Investment Manager in its discretion."

46.     To be sure, the PPVA PPMs limited this discretion by requiring that the result represent "fair value." Platinum Management reassured investors by noting in its DDQs that its valuations were verified by an internal valuation committee. And the DDQs, tear sheets, and marketing presentations touted that Platinum Management used the services of an independent valuation agent. In reality, however, Nordlicht often instructed his staff to adjust the values of various positions up or down, with the staff left to flesh out the rationales for those adjustments.

47.     Platinum Management's external auditor in early 2015 reported to it that "a material weakness exists in the Master Fund's investment valuation process related to its Level 3 investments." Platinum Management did not disclose to its investors this important information. The auditor also identified a "very material" misstatement that required a large markdown of the valuation of one large, illiquid position, triggering a restatement of the fund's year-end 2013 AUM.

48.     Platinum Management terminated that auditor. Still, the replacement auditor included in its 2014 opinion, which it did not issue until September 2015, an "emphasis-of-matter" stating that management's estimated values for investments representing over $800 million rested on unobservable inputs, and that the amounts that might be realized in the near-term could differ materially from management's valuations.

49.     Platinum's substantial control over the valuations of its illiquid positions helped ensure that fund performance, which was largely composed of unrealized gains, remained steady. This was essential, because shortfalls in performance could be expected to trigger more redemptions, and so deepen the liquidity crisis.

**Overvaluation of Golden Gate Oil LLC Investment**

50.     A principal example of PPVA's growth in AUM through unrealized gains is Platinum Management's manipulation of the valuation of its disastrous investment in Golden Gate, a start-up oil production company it helped create in 2012.  In 2013 through 2014, PPVA's reported AUM of approximately $900 million to $1 billion rested heavily on the valuation of this single investment.  Whereas Platinum Management valued Golden Gate at approximately $78 million at the end of 2012 (when PPVA's equity interest in Golden Gate was 48% of the company, or $37 million), the value rose sharply to $173 million at the end of 2013 (when PPVA owned or had the option to buy a 100% interest).

51.     At the end of 2013, the Golden Gate equity and loan constituted approximately 19% of PPVA's AUM, the fund's largest position.  At the end of 2014, even after the price of oil had plummeted 60%, from $100 to $40 per barrel, PPVA valued its equity in Golden Gate at $140 million, less than 20% below its 2013 year-end valuation.  It also continuously valued at par its loans to Golden Gate, which reached $18 million in principal by the end of 2013, even though Golden Gate never made a single interest payment to PPVA.

52.     Throughout this period, Nordlicht was principally responsible for setting the valuation of Golden Gate for PPVA.  Golden Gate was vastly overvalued, for multiple reasons.

53.     First, PPVA sharply increased its valuation of Golden Gate while in fact the company's performance was falling far below initial projections, with minuscule oil production

and heavy operating losses. Golden Gate's first stage involved the drilling of seven wells, but it encountered large drilling cost overruns, consuming $18 million borrowed from PPVA by the end of 2013, as well as delays in obtaining needed permits. Moreover, the wells produced mostly water and many were shut in (*i.e.*, not producing). The only consistently-producing well provided revenue representing less than 10% of initial projections. As a result, far from generating the expected millions in cash flow to pay for future drilling, Golden Gate generated $6 million in net losses in 2013.

54.     Second, several transactions with third parties concerning the sale of some or all of Golden Gate's assets were for a mere fraction of the valuation that PPVA carried on its books for the same assets.

55.     For example, in October 2013, PPVA granted its partner an option to buy one of the two main Golden Gate oil fields for a mere $6.2 million, barely one-tenth of the value touted by PPVA for the same fields.

56.     At the same time, the partners granted each other an option to buy the other party's share for $60 million, effectively meaning that the whole company was worth roughly $120 million (rather than $173 million).

57.     One month later, though, Black Elk (another PPVA investment) reported in a public filing that it had obtained an option to buy the whole company for $60 million. This posed a problem for Platinum Management; Months later, a PPVA portfolio manager for Golden Gate told Nordlicht and Levy that a potential third party lender had brought up Black Elk's filing, saying "the issue is that it publicly discloses the value of the option and therefore pegs GGO [Golden Gate]'s value to $60M. This is ultimately a marketing issue that could be dealt with but something we should all be aware of."

58.     Then, in August and September of 2014, PPVA in fact bought out its partner's 52% interest in Golden Gate not for $60 million, or $30 million, but a mere $3.2 million, with an additional $5.9 million contingent on achievement of production levels that Golden Gate had not come close to achieving.  These actual option and sales prices belie Platinum Management's far higher valuations, including an enterprise valuation of at least $170 million it touted as of September 30, 2014.  Third, even internally Platinum Management personnel frequently acknowledged Golden Gate was worth much less than claimed.  In early 2012, Nordlicht initially scoffed at his portfolio manager's optimistic projections: "I cringe at the 1 billion PV-10 number [a measure of the present value of the oil reserves] as it doesn't mean anything . . . . when u have billion pv10 on fields that are worth 15 [$15 million] in sale now, it doesn't really mean much . . . ."  Likewise, in late 2012, one of Platinum's project managers for Golden Gate wrote to Nordlicht that once Golden Gate, as a first step, had about seven wells producing at its two fields, the value would rise to $45 million.  Nonetheless, at the end of 2013, when the drilling program had fallen far short even of that goal and Golden Gate was deeply in the red, Platinum Management increased PPVA's valuation of its interest to $173 million.

59.     Tellingly, in early 2014, Nordlicht did not grant discretionary compensation to the portfolio managers responsible for Golden Gate based on the valuation that was on PPVA's books.

60.     Fourth, Platinum Management took steps to mislead third parties who evaluated Golden Gate's reserves and the value of PPVA's interest in the company.  Those third parties were largely at Platinum Management's mercy, for they relied upon Platinum Management and Golden Gate for virtually all of the inputs used in their calculations.  For example, Platinum Management retained an independent valuation expert to buttress its own ultimate valuations, but

the valuation expert's quarterly reports repeatedly contained multiple false statements, obtained from Platinum Management, overstating the number of producing wells and the volume of oil production.

61.     When Platinum Management considered having Black Elk buy PPVA's interest in Golden Gate, an independent engineering firm chosen by Black Elk made preliminary estimates that valued Golden Gate's reserves at about 10% of the estimates made by the engineering firm retained by Golden Gate.  In particular, Black Elk's engineering firm found that most of the reserves should be characterized as merely "probable" rather than as "proven" – a critical difference since classifying reserves as proven rather than probable would have a positive effect on PPVA's interest in Golden Gate.  Nordlicht ordered that those lower estimates be ignored.

62.     Although Golden Gate's chosen engineering firm was willing to characterize more reserves as proven, that firm ultimately determined that it could no longer produce reserve reports for Golden Gate based on the company's pattern of making unrealistic projections of future well completions and production.

63.     Overall, Platinum Management and Nordlicht's words and conduct, including the exceedingly small consideration paid to obtain a larger equity stake in Golden Gate, and the decision to hold on to the Golden Gate asset in the throes of deep liquidity crises, reflect that Nordlicht understood that the valuations he was continuing to use for PPVA's balance sheet did not accurately reflect the lesser realizable value reflected by Platinum Management's negative experiences in attempting to develop profitable wells.

64.     Platinum Management's and Nordlicht's recklessly or knowingly inflated valuation of PPVA's interest in Golden Gate was material to the fund's overall valuation.  For example, the $3.2 million PPVA paid for the remaining 52% interest in Golden Gate in

September 2014 implied an enterprise value of about $6.2 million for the whole company.

Meanwhile, as of December 31, 2014, PPVA valued Golden Gate at $140 million. Deducting

the difference of $134 million from the fund's overall $872 million in "investments in securities"

as of the end of 2014 would reduce that line item on its balance sheet by 16%. Likewise, the

$134 million represented approximately 13% of PPVA's overall AUM of $1.04 billion as of the

end of 2014.

65.    By failing to adjust Golden Gate's valuation to match reality, Nordlicht and

Platinum Management inflated the management and incentive fees they received based on that

inflated valuation.

66.    Meanwhile, Platinum Management responded to investor skepticism about

Golden Gate by misleading at least one investor who raised repeated concerns about PPVA's

energy positions and their valuation. On March 28, 2014, investor relations official Mann

provided this investor with a report about Golden Gate and Black Elk "that we have just created

for investors who would like to know more about the two positions." In fact, however, the report

was replete with misstatements exaggerating Golden Gate's performance. It included charts, not

labeled as either actual or projected, showing Golden Gate's first quarter revenues as $4.6

million. In fact, information readily available to Platinum showed that Golden Gate's revenue

for the first quarter (then almost entirely concluded) was less than 5% of the reported figure:

$229,000.

67.    Moreover, focusing just on revenues was misleading, because due to high

operating costs Golden Gate had a net operating loss of $100,000 for Q1 2014. The same report

reported Q1 2014 production as 508 barrels per day, when in fact net production for the quarter

was less than 30 barrels per day. The report also vastly overstated probable reserves, pegging

them at 16 million barrels, when the most recent engineering reserve report then available showed only 6 million barrels of probable reserves. The report also said that "Overall PPVA has lent less than $18 million to GGO." In fact, as of December 31, 2013, the amount lent was $18.4 million, and after further lending in January and February of 2014 the total outstanding stood at $21.8 million.

68.    These misstatements built upon Mann's statement to the same investor two days earlier, after speaking with Nordlicht, that Nordlicht had changed his mind about combining Golden Gate with Black Elk "since Golden Gate has been doing very well since then" – at a time when the project was in fact losing money and producing almost no oil.

### 2014: Growing Liquidity Crises and the Ensuing Black Elk Fraud

69.    By 2014, PPVA's liquidity crisis had worsened. SanFilippo sent Nordlicht and Landesman an email on February 5, 2014, attaching a chart entitled "December 31 Redemption Summary" that highlighted approximately $14 million in redemptions and other monies still owing to investors based on their December 31 redemption requests. Indeed, under the PPMs, payment was required within 30 days and so this amount was overdue. The same chart indicated that other, apparently preferred, investors, had been paid over $22,325,000 in connection with the same quarterly redemption period.

70.    Likewise, in a board meeting of the Directors of PPVA International held on March 12, 2014, in which Nordlicht and Landesman participated, Platinum Management acknowledged that the fund had experienced a greater number of redemptions than net capital contributions during 2013. Platinum Management also represented to the Board that 40% of the fund could be liquidated in 30 days, but it also represented that it was focusing on making the portfolio more liquid.

71.     Despite these promises, when an investor emailed Landesman on April 29, 2014 asking when the wires would go out for the April 1 redemptions, payments for which were due no later than the next day, Landesman could not answer and instead forwarded the email to SanFilippo, asking: "What can I tell Jacques?"

72.     Later on April 29, 2014, Nordlicht sent an email to San Filippo stating: "Start paying down reds [redemptions] as u can. Between Blake and ppbe (additional 10 million), shd have decent short term infusion. Hopefully some may 1 subs [subscriptions] show up as well. Have a few more outflows to discuss but this is obviously the priority." As indicated in Nordlicht's stated hope about subscriptions showing up, PPVA was heavily dependent on the infusion of new money from both subscriptions and other sources to meet its ongoing redemption obligations and lacked sufficient liquid assets in its portfolios to meet its redemption obligations.

73.     A June 3, 2014 email from a Platinum employee to Nordlicht and others entitled "Cash Sheet" listed cash on hand of $96,000; "Pending Inflows" totaling $20,000,000; "Pending Outflows" totaling $16,750,000 and Redemptions of $500,000 for May and $9,500,000 for June, which resulted in a "Projected Cash" of negative $6,154,000. Nordlicht forwarded this email to another employee instructing him to: "Take June reds off the list," suggesting that they were unable to meet the pending June redemptions of $9,500,000 due to cash flow problems.

74.     On June 16, 2014, Nordlicht emailed Landesman that the firm was in "code red" due to its inability to match redemptions with quarterly inflows of investor funds. Nordlicht stated:

> It can't go on like this or practically we will need to wind down. This is not a rhetoric thing, it's just not possible to manage net outflows of this magnitude. I think we can overcome this but this is code red, we can't go on with the status quo. … We can't pay out 25 million in reds per quarter and have 5 come in…."

Landesman responded: "We are pushing hard, illiquidity a bigger hurdle than energy concentration…Need monetization/liquidity events in the fund…" Nordlicht replied: "….We just need to short term go crazy, get everyone focused, and long term try to come up with marketing pitches where we can raise even when we are illiquid."

75.    In early 2014, these same liquidity problems caused Nordlicht to focus on Black Elk, PPVA's other large, illiquid energy investment.

76.    Black Elk operated oil wells in the Gulf of Mexico, and PPVA was its principal lender. Platinum Management officials once considered the Black Elk position one of the strongest in PPVA's portfolio. At the end of 2012, Platinum Management's valuation of Black Elk represented 24% of PPVA's total assets. However, Black Elk's ambitious expansion plans ran into problems after a deadly 2012 explosion on an offshore rig prompted numerous official investigations. By 2014 its economic performance was mixed and it was struggling to pay its bills.

77.    Meanwhile, as of early 2014, PPVA owned the vast majority of Black Elk's preferred shares, and a large portion of Black Elk's $150 million face value of outstanding senior secured notes. PPVA also had the power to control Black Elk's management, as admitted by Black Elk in its Form 10-K, as PPVA owned about 85% of the outstanding voting membership interests and had the authority to appoint and remove all Black Elk key personnel and determine management policies.[1]

---

[1] "As of December 31, 2013, Platinum beneficially owned approximately 85% of our outstanding voting membership interests and approximately 66% of our total outstanding membership interests. As a result, and for as long as Platinum holds a membership interest in us, Platinum has the ability to remove and appoint key personnel, including all of our managers, and to determine and control our company and management policies, our financing arrangements, the payment of dividends or other distributions, and the outcome of certain company transactions or other matters submitted to our members for approval, including potential mergers or acquisitions,

78.     Moreover, PPVA aggressively exercised this power, through Nordlicht, as well as through Levy and Small who were also PPVA portfolio managers for Black Elk. They did so by appointing a majority of Black Elk's Board of Managers, appointing Shulse as CFO, repeatedly forcing the CEO to rescind his firing of that CFO and otherwise usurping the CEO's authority, making prolonged, almost weekly visits to Black Elk's Houston office, and controlling which of Black Elk's vendors were paid (if at all) and when. As the CEO later testified in Black Elk's bankruptcy proceeding, "Platinum was calling all of the financial shots. I would say as of February [2014], they were in complete control of, you know, essentially almost every daily activity and most certainly stayed on top on every penny in and every penny out."

79.     Nordlicht decided to use this control over Black Elk not to try to turn around the company's business, but to plunder its assets for the benefit of PPVA and its affiliates, by getting repayment of most or all of approximately $110 million in Black Elk preferred shares held by those entities. A key reason was to stave off PPVA's liquidity crisis. Nordlicht acknowledged the liquidity crisis in vivid terms in an email to Small on March 17, 2014:

> This is also a week I need to figure out how to restructure and raise money to pay back 110 million of preferred which if unsuccessful, wd be the end of the fund. This 'liquidity' crunch was caused by our mismanagement –yours David and I – of the black elk position so I will multitask and also address your concerns but forgive me if I am a little distracted. I have been up until 3 am for the last two weeks working through this issue.

80.     In 2014, Black Elk agreed to sell much of its prime assets to Renaissance Offshore, LLC. Platinum Management, Nordlicht, Levy and Small schemed to divert the proceeds from that sale to redeem preferred shares, most of which were held by PPVA and affiliated funds. However, the Black Elk note indenture required that such proceeds be paid first

---

asset sales and other significant corporate transactions. As a controlling member, Platinum could make decisions that may conflict with noteholders' interests."

to the noteholders, and many of the notes were held by non-Platinum parties. So the Platinum parties thus devised a scheme to amend the note indenture to authorize that proceeds of the Renaissance sale be paid to holders of Black Elk Class E preferred shareholders, mostly PPVA, PPCO and two other affiliated funds.

81.     The problem for Platinum was that a majority vote of noteholders was required to amend the indenture. Platinum controlled a majority of the notes, but it could not vote. As the consent solicitation later recited, "Notes owned by the Company or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company shall be disregarded for purposes of determining the majority." Moreover, independent noteholders would have no reason to vote for such an amendment, as it would divert the proceeds of the sale of key Black Elk assets to parties junior to themselves.

82.     Therefore, Platinum personnel devised a scheme to obtain the necessary consents in a manner that deceived independent noteholders. Specifically, Nordlicht, Small and Levy worked to transfer the Black Elk notes held by PPVA to parties he and Small called "friendlies."

83.     In a March 11, 2014 email, Nordlicht wrote to Shulse, Levy, Small and another individual, that "We are likely to have friendlies buy the bonds as of tomorrow."

84.     Two days later, Shulse sought to benefit from his support for this effort, asking for "a substantial bonus, 1% of the amount of preferred's actually paid back to Platinum." He added, "Platinum getting its money out of Black Elk is a good thing for Platinum and it should be a good thing for me as well."

85.     At one point, the plan was to quietly get pro-Platinum parties representing a majority of the notes to sign consents, without consulting independent noteholders. However, the note indenture trustee resisted, insisting on a formal consent solicitation process. As Shulse

explained in an email to Nordlicht, Small and Levy: "they don't trust our consents are valid because we have received a default notice in the past 60 days and we have the behind the scenes process with various dates on our consents."

86.     Nordlicht's response to the idea of an open consent solicitation was a vehement no.

87.     Shulse, showing a complete understanding of and support for Platinum's scheme to control a majority of the notes, supported the solicitation: "the quickest way is to do the formal solicitation . . . get our 51% in order . . . vote it through the DTC/BNY agents and end it." He added, "why are we afraid of an open solicitation? Probably going to avoid a lawsuit and if we have the bonds we say we do, the process ends as soon as we get over the number?"

88.     On May 12, 2014, Shulse sent an email to Levy, Small, and Nordlicht suggesting they slip an announcement regarding the amendment to the indenture "in with the 10Q filing so it has a chance to get lost and not seem like such a big deal."

89.     Nordlicht, Levy and Small eventually decided to pursue a formal consent solicitation, albeit a rigged one. Crucial to this effort was the transfer of a large number of notes from PPVA and its affiliates to BAM and its Beechwood affiliates. BAM was closely affiliated with Platinum Management through majority ownership by Nordlicht and other owners of Platinum Management, and through Nordlicht's influence over the entity thanks to the installation of Levy as CIO and many other Platinum officials in key positions at BAM. Indeed, in early 2014 Nordlicht told a third party that he planned to leave Platinum for BAM as of January 1, 2015.

90.     All told, prior to the consent solicitation, PPVA transferred over $37 million in Black Elk notes to BAM and two related entities, BBIL SHIP and BBIL ULICO 2014 Trust, at

prices Nordlicht designated.

91.     Numerous emails reflect Nordlicht's involvement:  In a May 13, 2014 email,

Nordlicht instructed that "Beechwood is buying 8 million black elk from PPVA. What is the best

way to cross? Can we do it today please."   Similarly, on June 23, 2014, he emailed: "I want to

move/sell 10 million of black elk bonds to bbil the nomura account. Please take care of it."

After confirming that BBIL was buying the bonds from PPVA, Nordlicht emailed instructions on

July 1, 2014, to sell $7 million in Black Elk bonds from PPVA to BBIL SHIP at a price of 99.

92.     Levy's position as BAM's CIO (along with the fact that many other Platinum

Partners officials were also BAM officials) assured Nordlicht that the BAM-related entities

would support the scheme.  By July 3, the Platinum Partners-related funds and BAM-related

entities held almost $100 million out of the $150 million in Black Elk notes, as reflected on a list

shared by Nordlicht, Levy and Small.

93.     Meanwhile, Nordlicht, Small, Shulse and Levy participated in the drafting of a

document to be circulated to all noteholders, which contained two closely related parts.  The first

was a tender offer, which offered to buy back notes at par.  The second part was a solicitation to

consent to note indenture amendments, most notably including that the proceeds of the

Renaissance sale would, after payment of any tendered notes, be payable to holders of preferred

shares, who were disclosed to be mostly Platinum Partners-related entities.

94.     During the drafting process, on July 3, Small circulated to Black Elk counsel a

disingenuous deceptive hypothetical question about whether $5 million in notes owned by an

affiliate had to be excluded from voting – in fact, PPVA and its affiliates held more than $98

million in notes.  Still, counsel confirmed that even Small's hypothetical $5 million in affiliate-

held notes would have to be disregarded in the vote, and Small forwarded this finding to

28

Nordlicht and Levy.

95.     Despite their knowing this key principle, the final consent solicitation contained this false representation:

> As of the date hereof, there are $150 million aggregate principal amount of Notes issued and outstanding under the Indenture. <u>Platinum Partners Value Arbitrage Fund, L.P. and its affiliates,</u> which own approximately 85% of our outstanding voting membership interests, <u>own approximately $18,321,000 principal amount of the outstanding Notes. Otherwise, neither we, nor any person directly or indirectly controlled by or under direct or indirect common control with us, nor, to our knowledge, any person directly or indirectly controlling us, hold any Notes.</u> (Emphasis added.)

The $18 million figure was a vast understatement, as it failed to disclose the $72 million in other notes held by PPVA affiliates and BAM-related related entities.  Knowing the consent solicitation contained this falsehood, and that the vote was rigged, Small signed the Black Elk Board of Managers' authorization for Black Elk to conduct the consent solicitation, and to implement it should it be approved.

96.     Also, while formally the solicitation preserved the priority of tendering noteholders, in reality the offer discouraged tenders by its unattractive terms.  Because the notes were callable months later at par, tendering meant foregoing months of interest for no gain.

97.     However, not tendering would be a mistake if the consent solicitation were approved.  In the end, $11 million in notes were tendered by independent noteholders.

98.     Platinum caused all of the notes held by its PPVA and its undisclosed affiliates, including PPCO and PPLO, and the  Beechwood entities to vote in favor of the consent solicitation <u>but</u> without tendering.  Levy was copied on the document by which Beechwood entities cast their votes in that manner, against their own interests as noteholders but in favor of the interests of preferred shares held by PPVA and affiliated funds.

99.    Small signed the consent of Black Elk's board of managers which falsely recited that "the Company has received sufficient consents" to amend the indenture.  On August 14, 2014, Black Elk falsely claimed in a press release that "holders of $110,565,000 principal amount of the Notes, or 73.71% of the Notes, had validly consented to the Consent Solicitation." (Emphasis added.)  On August 21, Black Elk issued a Form 8-K announcing that it had received "the requisite consents" of noteholders' to, among other things, apply the proceeds from the recently-concluded Renaissance sale to retire the tendered notes and use the remaining proceeds to repurchase preferred equity issued by Black Elk.

100.    On August 18, Small, from his Platinum email address, but purporting to speak for the Black Elk board of managers, directed Shulse to wire $70 million in partial payment of Class E preferred shareholders.  Levy meanwhile sent Shulse specific wire instructions for sending to PPVA and other designated parties most of the proceeds from Black Elk's sale of assets to Renaissance. This included three other Platinum Partners funds, and one third party to which Platinum had sold preferred shares and was subject to a put repurchase obligation.  The $20 million of Black Elk sale proceeds sent to that party extinguished that obligation.  After Nordlicht pressed Shulse to "send these wires out already," Shulse complied with the directions.

101.    All told, from August 18 to 21, 2014, Black Elk wired approximately $98 million in Renaissance sale proceeds for the benefit of PPVA and its affiliated funds, including PPCO and PPLO.  One other such fund, PPBE, set up specifically to invest in Black Elk notes, distributed its share of those proceeds to its investors.  Among those investors were Levy and Small, who received $256,678 and $102,671, respectively, thus benefiting directly from the Black Elk fraud.